**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION**

| | |
|---|---|
| SHARON WOJCIK, ) | |
| ) | |
| Plaintiff, ) | Case No. 1:22-CV-06518 |
| ) | |
| vs. ) | Judge Sharon Johnson Coleman |
| ) | |
| METROPOLITAN LIFE INSURANCE ) | Magistrate Judge Jeffrey Cole |
| COMPANY d/b/a METLIFE, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT MOTION**

The plaintiff, **SHARON WOJCIK**, by her attorneys, KAUFMAN LEGAL GROUP, LTD., submits this Memorandum in Support of Motion for Summary Judgment, as follows:

*I. Introduction*

The plaintiff, Sharon Wojcik (hereinafter the "plaintiff or "Sharon")[1] was married to Jerold Wojcik (hereinafter the "decedent" or "Jerold") and were residents of Cook County, Illinois. (Answer to Amended Complaint, ¶1). Sharon was named as the beneficiary on all of Jerold's life insurance policies. (Answer to Amended Complaint, ¶7 and Docket No. 21-2, MET 88). On August 6, 2019, Jerold was in a tragic accident when the vehicle he was travelling in caught fire with him inside. (Docket No. 21-2, MET 153-157). He died as a result of thermal and inhalation injuries due to car fire. (Docket No. 21-2, MET 135-144). When the decedent died, he had Accidental Death and Dismemberment Insurance and Supplemental Accident Death and Dismemberment Insurance (hereinafter collectively referred to as "AD&D") through his employer's Group Policy Number 123660-1-G (hereinafter the "Plan") with the defendant,

---

[1] On August 12, 2019, Sharon contacted MetLife and authorized her daughter, Jamie Isabelli, to speak and act on her behalf. Although a majority of the communications and interactions with MetLife were with Jamie Isabelli, we do not make a distinction between her and her mother, and in this Memorandum, we only refer to Sharon or the plaintiff.

Metropolitan Life Insurance d/b/a MetLife (hereinafter the "defendant" or MetLife"). (Answer to Amended Complaint, ¶6, ¶8). When the plaintiff made a claim under the AD&D provision of the Plan, the defendant denied her claim on the basis that the manner of death could not be determined. (Answer to Amended Complaint, ¶11, ¶12). The plaintiff now moves for summary judgment against the defendant.

## II. *Relevant Policy Provisions*

**ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE**

If You sustain an accidental injury that is the Direct and Sole Cause of a Covered Loss described in the SCHEDULE OF BENEFITS, Proof of the accidental injury and Covered Loss must be sent to Us. When we receive such Proof We will review the claim and, if We approve it, will pay the insurance in effect on the date of the injury.

**Direct and Sole Cause** means that the Covered Loss occurs within 12 months of the date of the accidental injury and was a direct result of the accidental injury, independent of other causes.

We will deem a loss to be the direct result of an accidental injury if it results from unavoidable exposure to the elements and such exposure was a direct result of an accident.

**PRESUMPTION OF DEATH**

You will be presumed to have died as a result of an accidental injury if:
- the…vehicle in which You were traveling…is wrecked

**BENEFIT PAYMENT**

For loss of Your life, We will pay benefits to Your Beneficiary

(Docket No. 21-2, MET 65-66).

**FILING A CLAIM**

**CLAIMS FOR FILING INSURANCE BENEFITS**

The beneficiary or beneficiaries should complete the claim form and send it and Proof of the death to Us as instructed on the claim form.

2

(Docket No. 21-2, MET 75).

> **Proof** means Written evidence satisfactory to Us that a person has satisfied the conditions and requirements for any benefit described in this certificate. When a claim is made for any benefit described in this certificate, Proof must establish:
>
> - the nature and extent of the loss or condition;
> - Our obligation to pay the claim; and
> - the claimant's right to receive payment.

(Docket No. 21-2, MET 40).

> **Prudent Actions by Plan Fiduciaries**
>
> In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.

(Docket No. 21-2, MET 84).

## II. *Standard of Review*

### A. *Summary Judgment Standard of Review*

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is "no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*; *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998). Where, as in this matter, the Court is faced with cross-motions for summary judgment, the Court must construe the record in the light most favorable to the plaintiff and draw all reasonable inferences therefrom in favor of the plaintiff. *Id.*

### B. *ERISA Standard of Review*

The *de novo* standard of adjudication is the default standard of judicial review in ERISA litigation according to *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, if the plan establishes discretionary authority to the plan administrator, then a deferential standard

of review is applied. *Id.* While the arbitrary and capricious standard of review is lenient, it must still have teeth, and so a review under this standard cannot just be a rubber stamp to uphold the denial of benefits by a plan administrator's irrational decision. *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010).

## III. Argument

### A. *Defendant Arbitrarily and Capriciously Denied Plaintiff's Claim*

The Plan imposes a duty on its fiduciaries to act prudently and in the interest of its participants and beneficiaries, such as Sharon. (Docket No. 21-2, MET 84). MetLife however appears to have treated Sharon as its adversary rather than complying with its fiduciary obligations under the Plan and under ERISA, as required by 29 U.S.C. § 1104(a)(1).

MetLife must be reminded of its fiduciary obligations. In *Gaither v. Aetna Life Ins. Co.*, the Court observed that "as a plan fiduciary, it [MetLife] plays a role like that of a judge in a purely adversarial proceeding, where the parties [Sharon] bear almost all of the responsibility for compiling the record, and the judge bears little or no responsibility to seek clarification when the evidence suggests the possibility of a legitimate claim." 394 F.3d 792, 807-808 (10th Cir. 2004). Instead, ERISA requires "a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied . . . the reason for the denial must be stated in reasonably clear language, . . . [and] if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003).

Where the same entity determines both a claimant's eligibility for benefits and also pays benefits, "this dual role creates a conflict of interest; that a reviewing court should consider…as a factor in determining whether the plan administrator has abused its discretion in denying benefits."

*Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 108 (2008). To mitigate that conflict, the Supreme Court in reiterated that:

> ERISA imposes higher-than-marketplace quality standards on administrator and sets forth a special standard of care upon a plan administrator, namely, that the administrator 'discharge [its] duties' in respect to discretionary claims processing "solely in the interests of the participants and beneficiaries" of the plan, §1104(a)(1); it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators "provide a 'full and fair review' of claim denials," *Firestone*, 489 U.S., at 113, 109 S. Ct. 948, 103 L. Ed. 2d 80 (quoting §1133(2)); and it supplements marketplace and regulatory controls with judicial review of individual claim denials, see §1132(a)(1)(B).

*Id. at 115.*

In determining whether a defendant acted arbitrarily and capriciously in denying a plaintiff's accidental death benefits, the court must evaluate the reasonableness of the defendant's decision in light of the evidence and information available at the time the decision was made. *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 278-79 (7th Cir. 1994). Similarly, as here, MetLife did not meet those standards and acted arbitrarily and capriciously when it decided to deny Sharon her AD&D benefits.

The sole basis of the MetLife's denial is Jerold's Death Certificate. In the initial denial letter dated May 28, 2020, and the denial letter after the appeal dated December 2020, the defendant advised Sharon that "[a]s the loss could not be determined in manner, it would not be eligible for Accidental Death Insurance and Supplemental Accidental Death Insurance." (Docket No. 21-2, MET 150 and 162-163). This is further supported by the defendant's internal course of action written by Dennis Spellman on May 19, 2020, wherein he wrote "[b]ecause the manner of death cannot be determined, it can not be proven that an accident occurred." (Docket No. 21-2, MET 148).

5

This statement by Mr. Spellman however is inaccurate, incomplete, and precisely why MetLife's decision to deny the plaintiff's AD&D claim was arbitrary and capricious. The defendant was supposed to start with the presumption that a named insured's death *was* a result of an accidental injury. (*See* Docket No. 21-2, MET 65-66). The defendant can then look to any other evidence in the record which may prove the death was intentional or if the death fell under any of the numerous exclusions listed in the Plan.

Instead, the defendant, through Dennis Spellman, started with the presumption that Jerold's death was *not* the result of an accidental injury. The defendant then looked at the Death Certificate and decided that because the manner of death could not be determined, then Jerold's death was not an accident.

If the defendant had started with the proper presumption, in accordance with the Plan, then Jerold "will be presumed to have died as a result of an accidental injury if" the vehicle he was travelling is wrecked. (Docket No. 21-2, MET 65-66). The defendant should have then concluded that not being able to determine the manner of death, as stated on the Death Certificate, does not refute the presumption that Jerold's death was accidental. And, because Jerold's death did not fall under any of the exemptions listed in the Plan, the defendant decision should have been to approve the plaintiff's AD&D benefit.

If the defendant was not going to allow any claims where the Death Certificate stated Manner of Death Could Not Be Determined, then it should have included that in its vast list of exclusions. The defendant could have easily added an exclusion which stated – We will not pay benefits under this section if the manner of death on the Death Certificate states anything other than Accidental. MetLife did not have such an exclusion and therefore it should have approved the plaintiff's AD&D benefits.

6

### B. *All Records Must be Included as Part of the Administrative Record*

Although the record beyond what an administrator reviewed is generally not considered in ERISA benefits claims subject to arbitrary and capricious review, it is still the administrator's burden to provide an explanation for its decision consistent with the record and ERISA. *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. # 506*, 545 F.3d 555, 563-564 (7th Cir. 2008). If the administrator did not explore an issue that it should have, the Court should remand the underlying claim before final judgment so that the administrator can reconsider. Unless it was so clear cut that it would be unreasonable for the plan administrator to deny the benefits on any ground. *Id.*

The court can limit itself to deciding the case on the administrative record but should also freely allow the parties to introduce relevant extra-record evidence. *Dorris v. Unam Life Ins. Co. of Am.*, 949 F.3d 297, 304 (7th Cir. 2020)*; Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 982 (7th Cir. 1999) (discovery may be appropriate to investigate a claim that the plan's administrator did not do what it said it would do). If the plaintiff must send records to prove their claim for a plan benefit, then the plaintiff should be permitted to patch any gaps of the records before the court reaches a judgment, even if those gaps in the record cut against the claim for benefits. *Id.*

MetLife knew there was additional evidence, other than the Death Certificate, Autopsy Report, Dental Report and Toxicology Report to prove, Jerold's death was an accident. MetLife however appears to have intentionally not sought out this additional proof, or if it did it not try very hard to obtain it. It can only be assumed that MetLife did not want this additional proof because, by not having it, MetLife would not have to look at additional evidence which would change its

7

immediate instinct that Jerold's death was an accident, and thus it would not have to pay the plaintiff's AD&D benefit.

At the time Sharon initiated her claim, the defendant offered to obtain, on behalf of Sharon, all the records, reports and other documents needed to prove Jerold's death was an accident. MetLife sent letters dated January 10, 2019 and February 24, 2019, offering to obtain any Police or Accident Reports, Autopsy Reports and Toxicology Reports ("Tox Report"), if the plaintiff signed an Authorization Form. When the defendant received the Sharon's executed Authorization Form, it sent two letters on March 25, 2020. (Docket No. 21-2, MET 111-114 and 116-119). The first was to the Cook County Sheriff's Police and the other was to the Cook County Medical Examiner. (Docket No. 21-2, MET 126). MetLife received a response from the Cook County Medical Examiner, and on May 12, 2020, the defendant obtained the Autopsy Report, Dental Report and Tox Report. (Docket No. 21-2, MET 135-144). The Medical Examiner opined that Jerold then died due to "Thermal and Inhalation Injuries Due to Car Fire." (*Id.*)

MetLife knew that Jerold died from "Injuries Due to Car Fire" and so it knew police and fire departments were called to the scene, and it knew that each of departments would have prepared their own reports. Yet, the defendant never followed up with its request to the Cook County Sheriff's Department, nor did it send any other letters to any other fire departments or police departments requesting additional proof. MetLife further knew that since Jerold's death was due to a car fire, a report from a fire department or investigator would be crucial to determine if he died from an accident.

MetLife had a duty to act "prudently and in the interest of" Sharon when it took on the responsibility of obtaining all the reports and records relating to Jerold's death in order to determine whether Jerold's death was "sustained [by] an accidental injury." (Docket No. 21-2,

8

MET 84). If MetLife based its decision on all the records and proof it was supposed to obtain on behalf of the plaintiff, then there would have been no doubt that Jerold's death was accidental. Instead, MetLife knowingly and intentionally advised an employee to disregard her attempts in obtaining additional records from the Orland Park Fire Department and Orland Park Police Department. (*See* Docket No. 21-2, MET 201).

Sharon obtained these records and reports on her own. She did not forward any of it to the defendant because she believed the defendant did what it said it would do, and what it was required to do, and obtained the proof on its own. *See Perlman,* 195 F.3d at 982. MetLife never advised the plaintiff that it did not obtain any incident, accident or investigative reports from the Orland Park Fire Department, the Orland Park Police Department, the Cook County Sheriff's Department, or any other agency/department. The defendant cannot deny that it knew these reports existed because the plaintiff had referenced the different reports from the different agencies during their many phone calls and emails. These investigative departments were also referenced in the records that the defendant had already received, as well as in its internal claims and communication system.

Even in May of 2020, the defendant knew that it should obtain additional reports from different departments regarding the investigation of the decedent's death however it did not send any requests for any additional information or reports. As a result of the defendant's failure and breach of duty in obtaining this proof, the Court must allow the administrative record to include the Orland Park Fire Protection District's Reports and the Cook County Sheriff's Department Incident and Evidence Reports. (See Exhibit A and B, attached hereto).

9

### C. *Jerold's Death Was Clearly Accidental*

On Friday, August 6, 2019, Jerold and Sharon were married and had just celebrated their 34th wedding anniversary two months prior. (Docket No. 21-2, MET 153-157). Jerold was a loving father of two children and had just become a grandfather to a baby he adored. (Id.) Jerold had plans for his family to come over for a pool party that weekend and where he would barbeque. (Id.)

When Jerold was leaving the house for work that morning, he kissed his wife goodbye and asked her if she was working that night and she responded no. (Id.) Jerold then told his wife that he was happy she was not working because he would finally get to spend some quality time with her. (Id.) He also told her that he would be picking up supplies for the weekend party after work. (Id.)

Jerold got into his 2004 Chevrolet Monte Carlo and began driving down the street of his subdivision with the front driver's side window halfway down. (Exhibit B, Page 5 and Exhibit A, Page 4). Jerold was only 2 blocks away from his home when 2 neighbors heard a loud noise coming from outside in front of their respective houses. (Exhibit B, Page 6). When they went to check out the noise, they each saw Jerold's car engulfed in flames and so they called 911. (Id.)

Officer Christopher Harris of the Cook County Sheriff's Police Department was dispatched to the car fire. (Id.) When Officer Harris arrived on the scene, he was met by the Orland Park Fire Protection District. (Id.) When the Orland Park Fire Protection District arrived, the car was fully engulfed in flames with the decedent in the driver's seat, and with a fully involved passenger compartment fire. (Exhibit A, Page 4). The Orland Park Fire Protection District deployed a 100-foot, 1¾ hose line and applied 50 gallons of water through the burned-out windshield to extinguish the fire. (Id.) When Cook County Criminalistics Investigator Lilliebridge arrived on the scene,

10

Jerold's car was still in gear and all windows had been shattered except the driver's side window which was halfway down. (Exhibit B, Page 8).

Once the fire was out, Jerold's body was found, seated in the front driver's seat in a pugilistic pose (boxer-like body posture). (Id.) A gas can without a cap was found inside Jerold's vehicle but there was no evidence that the gas can was filled at the time the fire started. (Exhibit B, Page 31). Jerold had not driven to the gas station that morning but if the gas can was left in the vehicle overnight without the cap, gas fumes would have filled up inside the car. This is supported by Jerold rolling down his window so he could let out the strong smell of gas and fumes. Opening the window also refutes any suggestion that he wanted a fire to start. Jerold was found in a pugilistic pose.

The pugilistic position of Jerold's body would further support that the fire was accidental and not intentional because Jerold's body would have been upright with his elbows and knees flexed and his arms and legs out and away from his torso. If Jerold was in a pugilistic position, then that also refutes any suggestion that he was bending down towards the gas can in the passenger compartment to intentionally start the fire. There was nothing found in either of his hands. There was no lighter found on Jerold or in the car.

The cause of the fire was "Incendiary Ignition of Accumulation of Ignitable Vapors." (Exhibit B, Page 8). The area of origin was within Passenger Compartment from a "Flame Producing Ignition Source…Inside Passenger Compartment Engaging Electrical Charger Cord." (Id.). In other words, the fire started in the passenger compartment of the vehicle when gas fumes were ignited by an electrical cell phone charger. (*See* Id.) Jerold then died due to "Thermal and Inhalation Injuries Due to Car Fire." (Docket No. 21-2, MET 138).

There was no way a reasonable person could conclude that Jerold's death was anything other than a horrific accident and the defendant's decision to deny the plaintiff's AD&D benefit was irrational. The defendant tried to base part of its decision on the Dental Report which claimed the decedent "had a vaping device in his hand." (Docket No. 21-2, MET 144). The defendant's reliance on this one line from the Dental Report is misleading hearsay, and a vaping device is not mentioned or corroborated in any other reports from any other person who was actually at the scene or who handled the body at the scene. The Autopsy Report does not mention anything about the body having a vaping device in hand. There was no evidence collected and inventoried by the Cook County Sheriff's Department which referenced a vaping device. (Exhibit B, Page 8).

The defendant acted egregiously when it breached its duty to the plaintiff by failing to obtain all of the records necessary to fully and fairly review her claim for benefits. The defendant also acted arbitrarily when it based its decision to deny benefits because of 4 words on the Death Certificate, as well as a single, baseless phrase by an Odontologist who was never at the scene.

When viewing all the records (proof) in this case in the light most favorable to the plaintiff and drawing all reasonable inferences in favor of the plaintiff and strictly against the defendant, there can be no genuine issues of material fact. Therefore, the Court must grant the plaintiff's motion for summary judgment and award to the plaintiff the life insurance benefits she is entitled.

### IV. Attorneys' Fees and Costs

The plaintiff should also be awarded attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the holding in *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 254 (2010), which approved fee awards under ERISA where a litigant has achieved "some degree of success on the merits." The Seventh Circuit recognizes two tests for fee awards that both favor an award here. *See Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis., Inc.*, 657 F.3d 496, 506 (7th Cir.

2011). The first test is the same five-factor test that the Supreme Court discussed in Hardt, 560 U.S. at 249, and which has been used widely in this Circuit. *See Nichol v. Pullman Standard, Inc.*, 889 F.2d 115, 121 n.9 (7th Cir. 1989) (citing cases). Those five factors are: "(1) the degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to satisfy personally an award of attorneys' fees; (3) whether or not an award of attorneys' fees would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' positions." *Id.*

Alternatively, a second test borrowed from the Equal Access to Justice Act, 28 U.S.C. §2412(d), "looks to whether or not the losing party's position was 'substantially justified.'" *Kolbe & Kolbe,* 657 F.3d at 506 (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998)). "[B]oth tests essentially ask the same question: 'was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?'" *Id.* (quoting *Quinn*, 161 F.3d at 478).

Under either standard, the court should award fees to Sharon since MetLife's decision was irrational without any evidentiary support. The court should also consider MetLife's actions in the context of the purpose of life insurance benefits and the financial support they are intended to provide when a loved one dies in a tragic accident. Accordingly, the court should award fees to Plaintiff.

*V. Conclusion*

Wherefore, the plaintiff, **SHARON WOJCIK**, respectfully requests this Court enter an order granting her motion for summary judgment, awarding the plaintiff the full benefits under the Accidental Death and Dismemberment and Supplemental Accidental Death and Dismemberment Insurance provisions of the Group Policy, including any prejudgment interest, awarding the plaintiff reasonable attorneys' fees and costs, and for any other relief the Court deems just and proper.

Respectfully submitted,

_____
Brett A. Kaufman

Brett A. Kaufman
KAUFMAN LEGAL GROUP, LTD.
4415 W Harrison Street - Suite 234
Hillside, IL 60162
(708) 375-5500
ARDC #6280329
brett@kaufmanlegal.net