IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

| | | |
|---|---|---|
| **SHARON WOJCIK**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.   1:22-CV-06518 |
| | ) | |
| vs. | ) | **Judge Sharon Johnson Coleman** |
| | ) | |
| **METROPOLITAN LIFE INSURANCE COMPANY d/b/a METLIFE**, | ) ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S COMBINED REPLY IN SUPPORT OF HER
MOTION FOR SUMMARY JUDGMENT MOTION AND
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The plaintiff, **SHARON WOJCIK**, by her attorneys, KAUFMAN LEGAL GROUP, LTD., submits this Combined Reply in Support of her Motion for Summary Judgment and Response to the defendant's Motion for Summary Judgment, as follows:

*I. Introduction*

The defendant, Metropolitan Life Insurance d/b/a MetLife (hereinafter the "defendant" or MetLife"), based its entire decision to deny the plaintiff's, Sharon Wojcik (hereinafter the "plaintiff or "Sharon") claim for her husband's, Jerold Wojcik (hereinafter the "decedent" or "Jerold"), Accidental Death and Dismemberment Insurance and Supplemental Accident Death and Dismemberment Insurance (hereinafter collectively referred to as "AD&D") benefits on one singular document – Jerold's Death Certificate. *That is, it*. The defendant did not review, obtain, request, notify, follow-up or search for anything else to support its determination that the Thermal and Inhalation Injuries Due to Car Fire that killed Jerold were not an accident.

MetLife attempts to infer that its decision to deny the plaintiff's AD&D claim is based on multiple sources by referencing the Death Certificate and the Autopsy Report, as if they are

different. These misleading attempts do not go unnoticed. MetLife knows that the manner of death listed on the Death Certificate was taken directly from the Autopsy Report. There were not 2 separate inquiries into the decedent's manner of death, one for the autopsy and one for the death certificate. The findings for the manner of death are one in the same.

Thus, the defendant's decision to deny Sharon's AD&D claim based on the single document – the Death Certificate – is <u>neither reasonable nor rational</u>.

## II. *Defendant Arbitrarily and Capriciously Denied Plaintiff's Claim*

Under the arbitrary and capricious standard, a reviewing court may overturn a decision where there is an absence of reasoning to support it. *Jackman Fin. Corp. v. Humana Ins. Co.*, 641 F.3d 860, 864 (7th Cir. 2011). The court may also consider whether the plan communicated a specific reason for its denial, whether the plan allowed claimant a full and fair review, and whether there was an absence of reasoning to support the denial. *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832-33 (7th Cir. 2009).

MetLife's initial denial letter dated May 28, 2020, stated MetLife based its denial solely on "the State of Illinois Certificate of Death and Autopsy Report states the manner of death could not be determined." (Docket No. 21-2, MET 150 and 162-163). It should be noted that there is no State of Illinois Certificate of Death. Jerold's Death Certificate was prepared by the Cook County Medical Examiner and recorded by the Cook County Clerk. Nevertheless, MetLife's denial of appeal letter dated December 29, 2020, was not based on any additional information or documentation. MetLife elected to unreasonably and irrationally ignore the plaintiff's emails, telephone calls and any references to investigative reports.

Applying the arbitrary and capricious standard of review, MetLife's decision to deny the plaintiff's AD&D claim prevails if rationally supported by the record however MetLife's determination to deny the claim fails as it is not rationally supported by the record. MetLife did not adequately consider the circumstances. There is nothing to support MetLife's decision and it is devoid of any reasoning.

MetLife alleges that "Dr. Khan's opinion [Autopsy Report] and the Death Certificate provide rational support for MetLife's determination to deny Wojcik's claim for payment of an AD&D benefit." It is not rational to determine a vehicle fire was intentionally set. It is not rational to conclude a person intentionally set themself on fire, while driving mere blocks from their home. It is not rational to conclude a person intentionally set themselves on fire without an ignition source. It is not rationale to conclude a person set themselves on fire using a vape device as an ignition source.

In *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010), the court faulted an ERISA plan for placing undue emphasis on test results that were not inconsistent with disability. Another court described the practice of emphasizing irrelevant findings as "the logical fallacy sometimes called the red herring," in which "the proponent addresses a new issue, usually one the proponent is prepared to address, in an attempt to distract or avoid the topic of the discussion." *Tobin v. Hartford Life & Accident Ins. Co.*, 233 F. Supp. 3d 578, 587-88 (W.D. Mich. 2017).

A reasonable person would conclude using a vape device to ignite or start a fire is not rational because a vape device has no flame.

> A vape device, also known as an electronic cigarette or e-cigarette, is a device that simulates the act of smoking by vaporizing a liquid solution, often called e-liquid or vape juice. Vape devices are battery-powered and consist of a heating element, a reservoir or tank to hold the e-liquid, and a mouthpiece through which the vapor is inhaled. When the

> device is activated, the heating element heats the e-liquid, converting it into a vapor that can be inhaled by the user.

"Vape device" prompt. *ChatGPT*, May 12 Version, OpenAI, chat.openai.com

> The heating element does not create a flame. Vaping devices have been known to start fires but that is only in stances where the vape device itself malfunctioned. For instance, there could be a short-circuit in the battery that causes overheating which leads to it catching fire.

"Can vape device start a fire" prompt. *ChatGPT*, May 12 Version, OpenAI, chat.openai.com

Nevertheless, the number of occurrences where a vape device is set on fire are so infinitesimal based on the number of times people inhale from vaping devices. Such occurrences also happen with such uncertainty that a reasonable person would not decide to use a vape device as an ignition source to set themselves on fire while driving in a car.

It is not rationale to determine that a person intentionally set themselves on fire by using a vape device to ignite the fire when the person would never really know when, or even if ever the vape device would malfunction, short-circuit, and then also burst in flames. It is also important to note that there was no vape device logged into evidence or found on the decedent's body. The Medical Examiner made no such references either. The Autopsy Report does not mention a vape device. The only reference is in the Dental Report. (See P's MSJ Memo, Page 12). If a vape device was actually found on the decedent, then it would have either been cataloged at the scene by the Cook County Sheriff's Criminalistics Section or identified and logged by the Medical Examiner. (Docket No. 26-2). The lack of such evidence only reenforces MetLife's irrational determination that the car fire was intentionally set by the decedent.

Cook County Criminalistics Investigator Lilliebridge determined the fire was set by an "Engaging Electrical Charger Cord." (Exhibit B/Docket No. 26-2, Page 8). Examples of such events are also so rare that it would not be rational to determine a person intentionally set

4

themselves on fire in a moving car waiting for their phone charger to hopefully, one day, at a specific time, send an electrincal spark that would cause a flame to ignite a fire. Even further there was no evidence of a lighter, matches or any other type of ignition source which would produce a flame that would be needed to start a fire. No rational person would conclude what MetLife concluded.

### III. *Manner of Death Not Conclusive*

The defendant's claim that no professional concluded the decedent's death was accidental is completely misleading. There are no reports which opine that Jerold's death was intentional. No reasonable person would conclude his death was intentional. The Medical Examiner's standard to decide what to list, is a completely different standard than what a reasonable person would determine when reviewing the facts and circumstances of a death. On a death certificate, the Medical Examiner is only permitted to choose from 5 options – Natural, Accident, Suicide, Homicide, Could not be determined (and in initial stages, pending investigation). The Medical Examiner must be 100% certain to list anything of the first 4 options. Here there was no investigation to determine if suicide, homicide or accident. If the Medical Examiner determined there was just a 0.1% chance the fire was not an accident, then the Medical Examiner was not permitted to list manner of death as an accident. The Medical Examiner was also not permitted to choose 1 of the first 4 options even if the Medical Examiner believed one of them was the most reasonable explanation of for the manner of death.

"Could not be determined" does not mean MetLife cannot determine the decedent's death was an accident. The Medical Examiner did not base her determination on anything other than that she knew a fire had occurred. The Medical Examiner did not look at or review any other evidence to determine whether Jerold's death was accidental or intentional. If someone drowns,

5

the Medical Examiner does not interview witnesses and family to determine if it was an accident or intentional. "Could not be determined" is listed when the Medical Examiner does not know with 100% certainty if the manner of death was natural, accident, suicide or homicide.

A death certificate is not the end all be all or even a good indicator of whether a death was accidental or intentional. The only way to determine which is to look beyond just the Death Certificate and the Autopsy Report and review reports from the Sheriff's crime lab, the local police and fire departments. MetLife cannot simply read a death certificate and deny a claim. Any reasonable person would seek out additional information before determining whether a person dying in a moving car, still in gear, that that caught fire with no normal ignition source, is not an accident.

The sole basis of MetLife's denial is the Death Certificate's manner of death. In its response brief, MetLife attempts to cite the manner of death in the Autopsy Report and the manner of death listed on the Death Certificate as two separate and distinct inquiries to support its decision to deny the plaintiff's AD&D claim. This is nothing more than smoke and mirrors. MetLife tries to make these separate inquires because it knows Dr. Khan used her Autopsy Report to fill out the Death Certificate. As a result, the entire basis of MetLife's denial is based on Dr Khan finding that the manner of death "could not be determined."

A reasonable person would not base their decision solely on that one piece of information. A reasonable person would attempt to fully evaluate the claim and look towards other evidence in an effort to make a rationale decision to either approve or deny a claim. In this case, it appears that initially, or possibly disingenuously, MetLife was going to attempt to do just that. Instead, MetLife advised its claims representatives to do the opposite.

6

A death certificate is not supposed to be the determining factor when deciding whether to approve or deny life insurance policies purposes. MetLife knows this. Otherwise, MetLife's AD&D policy provisions would include that only where death certificates list accident as the manner of death would AD&D claims paid. MetLife's policy however does not state anything about the death certificate. The reason why is clear. It is because MetLife knows a death certificate does not take all of the surrounding circumstances of the death when determining manner of death.

The defendant tries to insinuate that Jerold was suicidal because an empty bottle of Prozac was found in the car and his Toxicology Reports ("Tox Report") revealed fluoxetine and norfluoxetine in his blood. The defendant alleges that there were high levels of these compounds. This is simply not true. The compounds are the active ingredients in Prozac. The Tox Report specifically states that a "chronic daily doses of 40 mg for 1 month produced reported plasma concentrations ranging from 90 – 300 ng/mL for fluoxetine and 70 – 300 ng/mL for norfluoxetine." (Docket No. 21-2, MET 142). The decedent's levels were 530 and 83, respectively. The decedent was taking over 40 mg of Prozac for years which would cause the fluoxetine levels to be over 300 ng/mL. It should also be noted that the norfluoxetine was within normal range. The defendant coincidently does not reference that fact.

This is just another example of MetLife arbitrarily and capriciously insinuating Jerold was suicidal when in fact the toxicology results only show that Jerold was taking his medication as prescribed. In addition, there was no carbon monoxide found in Jerold's blood which means he died before inhaling anything burned in the fire which means he died when the car burst into flames so he would never have been able to attempt to get out of the car. This would also explain the car door being closed and having no burns on his back or buttocks.

*IV. All Records Must be Included as Part of the Administrative Record*

MetLife's main defense to support its denial of the plaintiff's AD&D claims is that it had no additional information because it was the plaintiff's responsibility to submit proof.

MetLife however completely ignores their unsolicited offers to assist the plaintiff in gathering additional documents and reports to help them determine whether the decedent's death was accident. MetLife sent not 1 but 2 letters to the plaintiff offering to help obtain records. Upon receiving a signed authorization from the plaintiff, MetLife only sent out a request to the Cook County Medical Examiner and the Cook County Sheriff. MetLife failed to make any other requests or efforts to obtain additional reports from the police or fire departments. MetLife even failed to follow up with the Cook County Sheriff when there was no response. MetLife also never sent requests for records to Orland Park Police and Fire Departments even though it knew such reports would be needed for their decision to approve or deny the plaintiff's AD&D claim.

The communications MetLife had with the plaintiff make it appear as though MetLife was working for her, or at least with her, to help get the evidence required to support her AD&D claim. MetLife even ends all of its correspondence with the plaintiff with the line "We're here to help." MetLife cannot notify claimants, including the plaintiff, of their willingness to help obtain documents, only to do nothing and not even advise the plaintiff that they did nothing to help. MetLife cannot offer such help only to now claim that it was the plaintiff's responsibility even though MetLife failed to even tell the plaintiff that it did not obtain or even attempt to obtain all the relevant reports.

Multiple MetLife claims representatives advised the plaintiff that her claim should have been approved and that they did not know why it was denied.

8

If MetLife alleges that it had no duty to the plaintiff and that its offers to assist with the claims process were empty gestures, then would appear to be intentional misrepresentation and possibly fraud. MetLife further alleges that it only has a fiduciary duty to its members and not claimants like the plaintiff. This is completely inaccurate. Not only does the Plan specifically state it owes claimants a fiduciary duty but MetLife, at a minimum, has a contractual relationship wherein it has a fiduciary duty to act in good faith and full fairness.

## V. Conclusion

Wherefore, the plaintiff, **SHARON WOJCIK**, respectfully requests this Court enter an order granting her motion for summary judgment, awarding the plaintiff the full benefits under the Accidental Death and Dismemberment and Supplemental Accidental Death and Dismemberment Insurance provisions of the Group Policy, including any prejudgment interest, awarding the plaintiff reasonable attorneys' fees and costs, and for any other relief the Court deems just and proper.

Respectfully submitted,

/s/ Brett A. Kaufman
Brett A. Kaufman

Brett A. Kaufman
KAUFMAN LEGAL GROUP, LTD.
4415 W Harrison Street - Suite 234
Hillside, IL 60162
(708) 375-5500
ARDC #6280329
brett@kaufmanlegal.net